NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THOMPSON DESIGN GROUP, : | |
| : | |
| Plaintiff, : | Civ. No. 05-2697 (GEB) |
| : | |
| v. : | **MEMORANDUM OPINION** |
| : | |
| 1101-1125 HUDSON STREET LLC and : | |
| GOTHAM PARTNERS, L.P., : | |
| : | |
| Defendants. : | |

**BROWN, Chief Judge**

This matter comes before the Court upon: (1) defendants 1101-1125 Hudson Street LLC ("Developer") and Gotham Partners, L.P.'s ("Gotham Partner") (collectively "Defendants") motion for partial summary judgment; and (2) plaintiff Thompson Design Group's ("TDG" or "Plaintiff") cross-motion for partial summary judgment. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will: (1) deny Defendants' motion for partial summary judgment; and (2) deny Plaintiff's cross-motion for partial summary judgment.

**I.   BACKGROUND**

Plaintiff's lawsuit concerns an agreement that it entered with the Developer on or about

1

December 16, 1999, to provide its services for the development of a parcel of waterfront property in Hoboken, New Jersey. (Klafter Certification Ex. A ("Agreement") at 1.)

Plaintiff filed the Complaint on May 20, 2005, asserting four claims against Defendants: (1) breach of contract; (2) unjust enrichment; (3) conversion; and (4) fraud. (Compl. ¶¶ 25, 32-35, 38-39, 42-47.) On June 2, 2006, Defendants filed a motion for summary judgment. The case was reassigned to the undersigned on November 15, 2006. On January 31, 2007, the Court denied Defendants' first motion for summary judgment. On February 1, 2007, Defendants filed the present motion for partial summary judgment. On February 28, 2007, Plaintiff filed its cross-motion for partial summary judgment. Both pending motions have been fully briefed by the parties, and the Court will now address the motions.

## II.   DISCUSSION

### A.   Standard of Review

In deciding a motion for summary judgment, a court should grant the motion if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987). In arguing

against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

      **B.**    **Breach of Contract Claims Pursuant to New Jersey Law**

To prevail on a breach of contract claim, a plaintiff must prove that a valid contract exists, that the defendant materially breached the contract, and that the plaintiff suffered damages as a result of the breach. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 833 (D.N.J. 2006). "In order for a valid contract to exist, [p]laintiff must show mutual assent, consideration, legality of the object of the contract, capacity of the parties and formulation of memorialization." *Id.*

According to the New Jersey Supreme Court, the basic principles for contract interpretation are as follows:

> [E]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. . . .
>
> The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.

*Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 269 (2006) (quoting *Atl. N. Airlines v. Schwimmer*, 12 N.J. 293, 301-02 (1953)).

3

### C. Defendants' Motion for Partial Summary Judgment

Defendants seek partial summary judgment regarding the application of Section 6 of the Agreement, entitled "Additional Compensation." Section 6.1 states:

> <u>Reduced Fee</u>. The Developer hereby acknowledges and agrees that the Fee is less than [TDG]'s usual and customary fee with regard to [TDG]'s services and that [TDG] has agreed to accept in lieu of additional amounts paid as a fee pursuant to Section 5 to accept the amounts to be paid pursuant to this Section 6, as consideration for providing the Services in Phases 1 and 2.

(Agreement, § 6.1) Section 6.2 of the Agreement describes how the additional compensation would be calculated:

> [TDG] is entitled to receive five percent (5%) of the first $13,000,000 by which Net Operating Profit (as defined below) exceeds Base Profit (as defined below) and ten percent (10%) of the amount by which Net Operating Profit exceeds the sum of Base Profit and $13,000,000.

(*Id.*, § 6.2.) That section defines the term "Base Profit" in the following manner:

> "<u>Base Profit</u>" shall mean:
>
> (i) $87,000,000 in the event there is no sale of the entire Property prior to or during the development thereof (<u>i.e.</u>, after the construction of improvements have commenced thereon);
>
> (ii) in the event there is such a sale of the entire Property during the development thereof, the sum of $30,000,000 plus the product of $57,000,000 multiplied by a fraction, which fraction shall never be greater than (1), the numerator of which is the aggregate actual Project costs incurred to the date of such sale and the denominator of which is the pro forma construction costs, as set forth in the most recently completed reasonable projection prepared for the Developer's lending institutions that are providing construction financing; and
>
> (iii) $30,000,000 in the event there is a sale of the entire Property prior to its development.

(*Id.*)

Defendants argue that the applicable Base Profit amount is $87,000,000 because there has

4

been no sale of the entire property. According to Defendants, the property is divided into five parts, identified as Blocks A-E. (Defs.' Br. at 4.) Defendants argue that pursuant to an agreement between the Developer and the City of Hoboken ("City") ("Developer's Agreement"), Block E would be donated to the City, and the Developer would receive a tax deduction for the donation. (*Id.* at 5.) According to Defendants, "[i]n January 2004, the Developer sold Blocks A-D of the Property to PT Maxwell, LLC, [("PT Maxwell")] which thereafter held Block E as the Developer's Nominee." (*Id.*) Defendants argue that there has been no "sale of the entire Property" because "[u]nder the Nominee Agreement [between the Developer and PT Maxell], the Developer, as Principal, remained the owner of Block E." (*Id.*)

In opposing Defendants' motion, Plaintiff argues that the sale of Blocks A-D and the conveyance of Block E to PT Maxwell constitute a "sale of the entire Property" as that term was understood by the parties. Plaintiff claims that "[t]he parties were anticipating three possible scenarios that would have three very different financial consequences for the Developer," and that in Section 6.2 of the Agreement, "they established three different Base Profit figures, in order that the Developer's own out-of-pocket outlays for improvements that would increase the value of the Property would be taken fairly into account . . . ." (Pl.'s Opp. Br. at 10.) According to Plaintiff, "[t]he structure of §6 is readily understandable as a business proposition: the more development costs incurred by the Developer, the higher its Base Profit figure would be." (*Id.* at 11.)

Plaintiff claims that "the Developer conveyed Blocks A-E to the Purchaser (Block E to the Purchaser as nominee)," and that "[PT Maxwell] assumed *all* of the costs of development of the *entire* Property – Blocks A through E." (*Id.* at 17 (emphasis in original).) According to

Plaintiff, although the Nominee Agreement provided that the Developer "shall be considered the owner of Block E for tax purposes," the Developer's title to Block E was "nominal" in nature because the purpose of that provision was to allow the Developer to "receive the benefit of a multi-million dollar charitable tax deduction . . . ." (*Id.* at 7, 9.) Plaintiff argues that, pursuant to the Nominee Agreement, "[PT Maxwell] – not the Developer – controlled Block E, was obligated at its own expense to develop Block E, owned the improvements, and was required to donate Block E, together with the . . . improvements thereon, to the City." (*Id.* at 7 (emphasis omitted).)

The Nominee Agreement notes that "Principal and Nominee have agreed that the parcel of land constituting the portion of the Property known as Block E . . . will be conveyed to Nominee as nominee for Principal . . . ." (Klafter Certification Ex. I ("Nominee Agreement") at 1.) It provides that:

> Nominee shall hold title to Block E as nominee on behalf of Principal in accordance with the provisions hereof, except with respect to any improvements constructed thereon in accordance with Section 2 of this Agreement. Principal and Nominee acknowledge and agree that as between themselves, Principal shall be considered the owner of Block E for tax purposes.

(*Id.*, § 1.) Section 2 of the Nominee Agreement identifies PT Maxwell's obligations with respect to the development of Block E:

> Nominee shall perform, at Nominee's expense, Principal's obligations with respect to the development of Block E as a waterfront park pursuant to Sections 4 and 5 of the Developer's Agreement to the extent Blocks A and B are developed in accordance with the Developer's Agreement. Nominee shall be considered for all purposes (including tax purposes) the owner of any improvements constructed on Block E by Nominee pursuant to this Section 2. The costs incurred by Nominee shall not be considered additional purchase price for the remainder of the Property.

6

(*Id.*, § 2.)  Section 3 describes PT Maxwell's obligations with respect to the donation of Block E to the City.  It states:

> To the extent Blocks A and B are developed in accordance with the Developer's Agreement, no later than the date required under the terms of the Developer's Agreement, Nominee will, in its capacity as Principal's nominee and on behalf of Principal, donate Block E to the City of Hoboken in accordance with the terms of the Developer's Agreement or, if required by the terms of the Developer's Agreement, to the owners of Block A through D subject to a conservation easement granted to a charity selected by the Planning Board of the City of Hoboken.  Contemporaneously with the donation of Block E, Nominee shall donate, on its own behalf, the improvements constructed on Block E pursuant to Section 2.  Until such time as Block E is contributed to the City of Hoboken in accordance with the Developer's Agreement, Principal will not engage in any business activities unrelated to Block E, and will not incur any indebtedness.

(*Id.*, § 3.)  Section 5, meanwhile, describes PT Maxwell's rights with respect to Block E:

> Nominee will be entitled to deal with Block E in all respects not inconsistent with the Developer's Agreement (including, without limitation, any mortgage, pledge or hypothecation of the Property and otherwise with respect to the development of the Property in accordance with the Developer's Agreement); provided, however, that in connection with any transfer of the Property to any person or entity (other than a mortgagee that acquires the Property by foreclosure or deed in lieu of foreclosure or otherwise), the transferee must acquire and assume Nominee's interest in Block E as nominee only and subject to the terms of this Agreement and, in such event, transferor shall be released hereunder.  For the avoidance of doubt, other than in accordance with the terms of the Developer's Agreement, Nominee shall not transfer Block E other than together with Blocks A and B, and Nominee shall not mortgage, pledge or hypothecate Block E other than together with Blocks A and B.  Notwithstanding the foregoing, any mortgage, pledge or hypothecation of the Property must allow for a release of Block E without release payments or other consideration at the time Block E is to be donated.

(*Id.*, § 5.)

The parties do not dispute that the Developer agreed to donate Block E to the City pursuant to the terms contained in the Developer's Agreement.  There is also no genuine dispute that the Developer sold Blocks A-D to PT Maxwell, and that the Nominee Agreement between

7

them included several provisions that defined PT Maxwell's rights and obligations with respect to Block E.  The parties also do not dispute that, after the conveyance of Block E, PT Maxwell became responsible for the costs associated with the development Block E.  Viewing these underlying facts, and drawing all reasonable inferences in favor of Plaintiff, the Court agrees with Plaintiff that there was a "sale of the entire Property" pursuant to Section 6.2 of the Agreement.

      Section 6.2 refers to the "sale of the entire Property" in the context of defining "Base Profit" earned by the Developer.  The Developer sold Blocks A-D to PT Maxwell, and conveyed Block E to it as well.  With respect to Block E, the Nominee Agreement provided that PT Maxwell "will be entitled to deal with Block E in all respects not inconsistent with the Developer's Agreement . . . ." (Nominee Agreement, § 5.)  The Nominee Agreement contained two types of limitations on PT Maxwell's rights with respect to Block E:  (1) requirements concerning the donation of Block E to the City; and (2) the continuing obligation on the Developer to pay taxes for Block E.  Both sets of limitations, however, were included to comply with the Developer's earlier agreement to donate Block E to the City pursuant to the terms of the Developer's Agreement.  Given the Developer's expectation that Block E would be donated to the City, the ownership rights that the Developer retained on Block E would not result in any additional profits.  Moreover, the Nominee Agreement provided that the Developer would no longer be responsible for the costs associated with the development of Block E.  (*Id.*, § 2.)

      For purposes of Defendants' present motion, then, the sale of Blocks A-D and the conveyance of Block E pursuant to the Nominee Agreement constitutes a "sale of the entire Property" in the context of Section 6 of the Agreement.  The Court will therefore deny

Defendants' motion for partial summary judgment.

### D. Plaintiff's Cross-Motion for Partial Summary Judgment

Plaintiff seeks partial summary judgment with respect to the calculation of Net Operating Profit ("NOP") as defined by the Agreement. The term is defined in Section 6.3 of the Agreement, which states:

> <u>Definition</u>. "Net Operating Profit" shall mean the aggregate of all taxable income from the Project for all periods from and after the date hereof, as reported on the Developer's and its subsidiaries' and affiliates' federal income tax returns and the associated K-1s delivered to the Developer's and/or subsidiaries' and affiliates' members, as the case may be, less:
>
> (i) a cumulative return of 20% per year, compounded annually, on the initial investment of capital made by the members of the Developer (including the $18,000,000 land acquisition cost);
>
> (ii) any additional investments of capital and/or loans made by the members of the Developer, together with a cumulative return thereon of 20% per year, compounded annually; and
>
> (iii) the accrued fees and the cumulative return of 20% per year, compounded annually, on the accrued fees owed to Maxwell Management (<u>i.e.</u>, George Vallone and David Gans) on account of the Project;
>
> plus
>
> (w) all amounts taken as depreciation;
>
> (x) all amounts paid to, or accrued on account of or on behalf of, the members of the Developer, its subsidiaries or affiliates, including without limitation as return of capital and/or repayment of loans, for services rendered to the Project, or otherwise (other than with regard to (A) the cumulative return described in item (i) above, (B) any additional investment of capital and/or loans and the cumulative return thereon described in item (ii) above, and (C) the fees and the cumulative return described in item (iii) above); and
>
> (y) all tax credits of which the Developer gets the benefit including without

limitation any historic tax credit.

(Agreement, § 6.3.)

Plaintiff argues that the Court should grant summary judgment with respect to the calculation of the NOP because there is no genuine dispute concerning the NOP's component amounts. The Court will deny Plaintiff's motion, for two reasons.

First, Plaintiff fails to explain clearly to the Court the values for several items that are necessary for calculating the NOP. Section 6.3(x) provides for the subtraction of "all amounts paid to . . . the members of the Developer, its subsidiaries or affiliates, including without limitation as return of capital and/or repayment of loans, for services rendered to the Project, or otherwise . . . ." (*Id.*, § 6.3(x).) In its proposed order, Plaintiff indicates that the amount described by Section 6.3(x) is $201,652, and identifies the item as "Payment to Ranieri net of reported distributions." (Pl.'s Revised Proposed Order at 8.) In the portion of its brief addressing loan repayments, however, Plaintiff fails to explain how it derived $201,652, and instead discusses several other amounts that do not appear in its proposed order. (*See* Pl.'s Revised Br. at 35.) Plaintiff further fails to explain how the amounts discussed in its brief should be calculated in determining the value for Section 6.3(x). Moreover, Plaintiff fails to calculate in its brief the final value for the NOP. Plaintiff indicates in its proposed order that the NOP is $59,002,139. (Pl.'s Revised Proposed Order at 8.) One component of that number – the amount calculated pursuant to Section 6.3(i)-(ii) – appears in the proposed order as $31,208,197, but appears in Plaintiff's brief as $37,070,065. (*Compare* Pl.'s Revised Proposed Order at 7 *with* Pl.'s Revised Br. at 21.) In its brief, Plaintiff does not calculate the amount for the NOP using either amount for the Section 6.3(i)-(ii) component.

Second, in addition to Plaintiff's failure to explain its proposed calculation of the NOP in a clear and consistent manner, there also remains a genuine dispute concerning a number of the component values that it calculates. The parties dispute, for example, the amount for "the aggregate of all taxable income from the Project for all periods from and after the date hereof . . . ." (Agreement, § 6.3.)  They also dispute the amounts "paid to . . . the members of the Developer, its subsidiaries or affiliates," as provided for by Section 6.3(x). (*Id.*, § 6.3(x).)

Plaintiff argues that "the aggregate of all taxable income" is $49,510,839, and refers to the Developer's federal income tax returns for the years 1999 to 2005 as support for that amount. (Pl.'s Revised Br. at 5.)  Plaintiff also claims that for purposes of Section 6.3(x), the amount paid to the Developer included "capital [] distributed to the Members of the Developer" "[o]ver the course of the Project, from 1999 through January 15, 2004 . . . ." (*Id.* at 21.)

Defendants, however, argue that Plaintiff includes "$13 million of loan proceeds in 2001 and $76 million in sales proceeds in 2004, as both taxable income and cash proceeds," and that in doing so, Plaintiff is "double-counting" the same profit amounts more than once. (Defs.' Opp. Br. at 5-6.)  In support of that argument, Defendants also refer to the Developer's 2004 and 2001 tax returns. (*Id.* at 5-7.)  Viewing these underlying facts, and drawing all reasonable inferences in favor of Defendants, the Court agrees with Defendants that, in calculating the Developer's NOP, Plaintiff included $13 million of loan proceeds in 2001 and $76 million in sales proceeds in 2004 more than once, and that summary judgment should therefore be denied with respect to Plaintiff's calculation of the NOP.

### III. CONCLUSION

For these reasons: (1) Defendants' motion is denied; and (2) Plaintiff's cross-motion is denied. An appropriate form of order is filed herewith.


Dated: April 13, 2007

                                                s/ Garrett E. Brown, Jr.
                                        GARRETT E. BROWN, JR., U.S.D.J.